[Civ. No. 19366. Second Dist., Div. Three. Feb. 10, 1953.]

L. DEAN PETTY, Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; C. J. GIBSON et al., Real Parties in Interest.

Joseph Doyle and L. Dean Petty, in pro. per., for Petitioner.

Harold W. Kennedy, County Counsel, and William E. Lamoreaux, Deputy County Counsel, for Respondent.

Dolley, Knight, Woods & Hightower for Real Parties in Interest.

WOOD (Parker), J.—Petition for writ of review. Petitioner, an attorney at law, seeks an annulment of an order of the superior court restraining him from representing the plaintiff and cross-defendant in a certain action.

On March 21, 1952, the petitioner, as the attorney for the plaintiff hereinafter mentioned, commenced an action in the superior court of Los Angeles County, entitled *Joseph R. Neaves, Jr.* v. *C. J. Gibson, et al.,* wherein the plaintiff sought an accounting by defendants under the terms of certain agreements between plaintiff and defendants covering the drilling for oil on property known as the "Hawn Deal," and an accounting for expenses in connection with said drilling operations.

On April 6, 1952, defendants answered the amended complaint in said action and filed a cross-complaint. The demurrer of plaintiff and cross-defendant to the amended cross-complaint was set to be heard on October 15, 1952.

On September 12, 1952, the attorneys for said defendants obtained an order to show cause why petitioner herein should not be restrained from representing, as an attorney at law, the plaintiff and cross-defendant. The order was made upon the basis that it would be improper for Mr. Petty to represent Mr. Neaves, because Mr. Petty had been attorney for him and Mr. Gibson in the preparation of the agreements referred to in said action.

On October 1, 1952, the order to show cause was heard upon affidavits as follows: an affidavit of Mr. Knight (one of the attorneys for defendants) which affidavit was the basis for issuing the order to show cause; affidavits of the petitioner herein (Mr. Petty), the plaintiff Neaves, and Mr. Doyle, one of the attorneys for plaintiff; and counteraffidavits of Mr. Knight and defendant C. J. Gibson. On said October 1st, the court ordered that L. Dean Petty (petitioner) be and is restrained from taking any part in the maintenance or trial of the action as attorney of record for plaintiff and cross-defendant, or as attorney assisting any attorney of record for said party, or at all. It was stipulated that the superior court file might be considered by this court.

Petitioner contends that the court acted without and in excess of its jurisdiction; and that the order is wholly without support in the evidence. He argues to the effect that in view of the fact that he represented both Mr. Neaves and Mr. Gibson in the preparation of said agreements, and in view of the nature of such representation and agreements, there was no privileged communication as between him and Mr. Gibson; and that it was not improper for him to represent Mr. Neaves in said action.

The affidavit of Mr. Knight stated that: he is one of the attorneys for defendants in said action; he is also one of the attorneys for said defendants in an action pending in a municipal court, in which an assignee of Mr. Petty sued them for attorney's fees for legal services allegedly rendered for defendants, including the preparation of the certain contracts involved in the present superior court case of *Neaves* v. *Gibson*; that Mr. Petty testified, in his deposition in the municipal court case, as follows: that he was employed by Mr. Gibson and Mr. Neaves to prepare all the said contracts; Mr. Gibson directed him many times as to what to do, talked over his problems, and Mr. Petty researched the lease and advised him on it; he first rendered legal services to Mr. Gibson on December 28, 1950, when Mr. Gibson came to his office and outlined the proposed agreement with Mr. Neaves as to the acquisition of the Hawn oil lease, and as to the drilling operations; thereafter and before the next office conference, he had two or more telephone conversations with Mr. Gibson; the next office conference was between January 5th and 10th, when Mr. Gibson and Mr. Neaves were present and the entire deal was discussed at length; after Mr. Petty had outlined the agreements of the parties as he understood them, he told

Mr. Gibson that there was quite a bit of work to be done, and he asked Mr. Gibson who was going to be his attorney in the matter; and that Mr. Gibson replied: "Why don't you draw all the agreements for both of us?" Mr. Petty replied that he would be glad to do the best he could to record the agreements in accordance with their mutual understanding; he was instructed by both of them to draw the agreements; Mr. Petty drew the agreement dated January 11, 1951,[1] and also the drilling agreement bearing the same date.[2] The affidavit

---

[1]It may be stated generally that the agreement of January 11, 1951, provided that the Coast Exploration Company, Lee Gibson (brother of C. J. Gibson), and Neaves each owned, as tenants in common, an undivided one-third interest in an oil lease which had been made by George H. Hawn, as lessor, and Coast Exploration Company and Lee Gibson, as lessees, which said interests were subject to one-eighth landowner's royalty, and subject to an overriding royalty of 7½ per cent retained by Des Moines Oil Company, assignor of the lease; that C. J. Gibson and Coast Exploration Company are engaged in the business of drilling oil wells under the name of Gibson Drilling Company, and have entered into a drilling contract for re-drilling a well on the Hawn lease to a depth of 6,940 feet; that Neaves shall incur no obligation in the drilling of the well except as provided in the drilling contract, which provides for the payment by Neaves of $20,000; that Neaves agrees to lend, concurrently with the making of said agreement, $10,000 to Gibson and Coast Exploration Company to be used exclusively by them in drilling the well, and said loan to be evidenced by a promissory note; that if the well is a commercial well, the parties shall enter into an operating agreement which shall provide that the Gibsons and Coast shall be the operators, that all expense of operating the well shall be borne one-third by Lee Gibson, one-third by C. J. Gibson and Coast, and one-third by Neaves; that a certain part of the casing in the well will be exchanged for more suitable casing, and that the additional expense of such exchange will be paid from the oil production; that the Des Moines Oil Company, assignor of the lease, shall receive, in addition to its overriding 7½ per cent royalty, one-fourth of the production after paying the landowner and the overriding royalty, until the amount due to the Des Moines Oil Company for casing has been paid; that from the remaining production, after paying operating expense, Lee Gibson shall receive 5 per cent, C. J. Gibson and Coast shall receive 5 per cent, and Neaves shall receive 5 per cent; the balance of the production is to be paid to Neaves until he has received $30,000,—$10,000 in repayment of said amount advanced by Neaves, and $20,000 in repayment of amount paid by Neaves for drilling the well.

[2]It may be stated generally that the drilling contract between C. J. Gibson and Coast Exploration Company, doing business as Gibson Drilling Company (referred to as Coast), as parties of the first part, and Neaves, as party of the second part, provided that it is the desire of Coast and Neaves that for consideration of $20,000 to be paid by Neaves to Coast, Coast will re-drill a well on the Hawn lease to a depth of 6,940 feet in a manner particularly set forth in the agreement; that Coast shall pay all bills for labor, taxes and insurance, and shall, upon demand of Neaves, exhibit all payrolls and bills; that Coast may charge not more than $2,000 for depreciation of its drilling equipment; that Neaves shall pay Coast $10,000 upon the execution of the agreement, and $10,000 when the well is on commercial production, or when drilled to a depth of

of Mr. Knight stated further that Mr. Gibson held several conferences with Mr. Petty, in connection with the preparation of the contracts, at which Mr. Neaves was not present; Mr. Gibson also conversed by telephone with Mr. Petty about certain matters when Mr. Neaves was not present.

On February 12, 1951, Mr. Petty prepared a supplemental agreement[3] for said persons. On March 21, 1951, he prepared another supplemental agreement[4] for them. On March 22, 1951, he prepared another supplemental agreement[5] for them.

The affidavit of Mr. Petty stated that: he is the assignor of plaintiff in said municipal court case against C. J. Gibson for attorney's fees; Mr. Gibson, in his answer in that case, denied that legal services were performed for him by petitioner herein; Mr. Gibson, in his deposition in that case, testified that he did not employ petitioner as his attorney or agree to pay

6,940 feet; that Coast shall furnish all drilling equipment necessary to complete the well; that Coast will render to Neaves, not less than 20 days after completion of the well, a complete accounting of expenses; that Coast is operating solely as an individual contractor, and Neaves has no obligation in connection with the drilling, except for the payment of said $20,000.

[3]By that supplemental agreement, Neaves agreed to pay $19,720.51 to the Des Moines Oil Company for casing, and it was agreed that the 7½ per cent overriding royalty of the Des Moines Oil Company would be assigned to, or held for the order of, Neaves in consideration of said payment, and that the agreement of January 11, 1951, would be modified to provide that the balance of oil production, after paying said royalties of one-eighth and 7½ per cent and 5 per cent to each of the parties, should be paid to Neaves until he had been paid said $30,000 and $19,720.51, or $49,720.51; then after such repayment, Neaves would assign one-half of the 7½ per cent royalty to C. J. Gibson; and thereafter, after deducting operating expenses, the oil production should be divided equally among Coast, Lee Gibson and Neaves,— one-third each; that the $19,720.51 was advanced by Neaves upon C. J. Gibson's guarantee that the well would be a producing well; that if the well was not a producing one, C. J. Gibson agreed to reimburse Neaves for one-half of the loss occasioned by failure to recover the casing from the well.

[4]By that supplemental agreement, Neaves agreed to advance $12,000 additional to pay unpaid bills for expenses in connection with the well; and it may be stated generally that the agreement of January 11th was modified to provide that the balance of oil production after paying said royalties and 5 per cent to each of said parties, should be paid to Neaves until he had been paid said $49,720.51 and $12,000, or $61,720.51.

[5]By that supplemental agreement, it was agreed that Des Moines Oil Company was holding for the account of Neaves and C. J. Gibson the overriding royalty of 7½ per cent, and it may be stated generally that the agreement of January 11th was modified to provide that Coast and Gibson agreed to obtain from Des Moines Oil Company an assignment of said 7½ per cent royalty to C. J. Gibson and to obtain a permit from the corporation commissioner authorizing such assignment; that after Neaves has been paid $61,720.51, he will assign to Coast or C. J. Gibson, as directed by them, one-half of said 7½ per cent royalty.

him for legal services in preparing said agreements; petitioner has been attorney for Mr. Neaves for some years prior to filing the complaint herein, and in 1950 petitioner represented him in two oil well ventures similar to the one in the present case, wherein Mr. Neaves and Mr. C. J. Gibson were parties; in said other ventures Mr. Gibson was represented by other attorneys; about January 5, 1951, Mr. Gibson and Mr. Neaves came to his office and jointly engaged petitioner and instructed him, in the presence of each other, to draw all necessary agreements concerning the oil well venture known as the "Hawn Lease"; his services in the preparation of the agreements continued from approximately January 5th to March 31, 1951; he billed Mr. Neaves and Mr. Gibson each for one-half the legal services; thereupon Mr. Gibson denied that he had employed petitioner and he refused to pay for any part of said services; all communications made to petitioner in connection with the subject matter of the present action and the preparation of said agreements were commonly known by Mr. Neaves and C. J. Gibson; at no time during said negotiations or any conference did Mr. Gibson or Mr. Neaves communicate to petitioner any communications which were confidential in nature in that they were not fully disclosed and understood by all parties to the agreements and incorporated in the agreements; no controversy, to petitioner's knowledge, arose in connection with the agreements until approximately October, 1951, when questions regarding proper accounting of the agreements were raised, ultimately resulting in the filing of the present action on March 21, 1952.

The affidavit of Joseph Doyle, attorney at law, stated that: on April 1, 1952, he became associated with Mr. Petty in the representation of plaintiff Neaves in the present action; in the complaint in the municipal court case, it was alleged that C. J. Gibson became indebted to Mr. Petty for $775.85, that $124.70 of said amount had been paid leaving an unpaid balance of $651.15, and that the indebtedness was incurred on an open book account for services rendered by Mr. Petty at Mr. Gibson's request; in the verified answer of C. J. Gibson in said case he denied said allegations of the complaint; that as between the averments in said answer and the averments in the affidavit of Mr. Knight there is contrast and conflict— the answer "contending" there was no relation of attorney and client, and the affidavit "contending" there was such a relation; the said agreements in the present case are the type of agreement normally found in a joint oil well venture and

are not the type of agreement in which there would be any confidential communications; Mr. Gibson, in his deposition, denied that he engaged Mr. Petty as attorney to represent him in the preparation of any of said agreements or in any matter in connection with the present case.

The affidavit of Mr. Neaves, plaintiff herein, states that: Mr. Petty has been his attorney for some years prior to the filing of this action; about January 3, 1951, Mr. Gibson approached plaintiff for the purpose of entering into a joint oil well venture known as the "Hawn Lease"; in the initial conferences regarding the venture, they jointly consulted Mr. Petty regarding the preparation of the necessary agreements; they jointly employed and instructed Mr. Petty to prepare all necessary agreements in connection with said venture; many conferences were had in Mr. Petty's office at which both plaintiff and Mr. Gibson were present; other conferences were had between plaintiff and Mr. Gibson not in the presence of Mr. Petty; certain conferences were had by plaintiff and Mr. Gibson with Mr. Petty individually; all said conferences pertained exclusively to the Hawn oil well venture; all communications made to Mr. Petty by plaintiff and Mr. Gibson were commonly known to both plaintiff and Mr. Gibson; at no time, to plaintiff's knowledge and belief, were any communications made by Mr. Gibson to Mr. Petty regarding any matter other than the preparation of the said agreements; Mr. Gibson failed to give a proper accounting and failed to comply with the agreement, and an actual controversy with Mr. Gibson did not fully develop until October, 1951; no controversy arose between plaintiff and Mr. Gibson during the period that services were rendered by Mr. Petty; that to plaintiff's best knowledge and belief no confidences were made by plaintiff or Mr. Gibson to Mr. Petty in connection with said agreements which were not fully known to plaintiff and Mr. Gibson.

The affidavit of C. J. Gibson states that: during 1950 Mr. Petty represented Mr. Neaves in connection with several contracts affiant had entered into with Mr. Neaves; in the early part of January, 1951, affiant and Mr. Neaves entered into an oral agreement with respect to the Hawn lease; affiant began drilling under the lease about January 8th and wanted to get the oral agreement reduced to writing quickly; in order to save time as well as attorney's fees, affiant decided not to submit the contracts that were to be drawn to other counsel; neither Mr. Petty nor Mr. Neaves stated that he would be ex-

pected to pay a part of the attorney's fees, except as to the application to be made to the corporation commissioner for a permit to transfer an overriding royalty; the charge made by Mr. Petty for preparing such application was $124.70, which sum affiant paid promptly; it was affiant's understanding that he was not to pay any part of the attorney's fees except as to said application; about April 20, 1951, he received a letter from Mr. Petty which stated in part that Mr. Petty had assumed that he was being employed by all the parties to handle the legal matters in connection with the well and that his fees would be paid by all of them; affiant had several private conferences with Mr. Petty regarding the agreements when Mr. Neaves was not present; it is not true that no controversy arose until October, 1951; during August, 1951, he received seven letters from Mr. Neaves regarding various matters that were in dispute—one of the matters was whether an income tax return should be filed on a joint venture basis; in August, he received a letter from Mr. Neaves which stated that the agreements did not constitute a joint venture; also in August he received a letter from Mr. Neaves which referred to controversies then existing as to whether checks drawn on the California Bank should be signed by the parties, and as to interpretation of the agreements; affiant did not refuse or fail to give a proper accounting, or fail to comply with said agreements.

As above stated, this is an action for an accounting. In the amended complaint, it was alleged, among other things, that defendants (referring to C. J. Gibson, individually, and doing business as Gibson Drilling Company, Coast Exploration Company, a corporation, and Lee Gibson) have failed to pay the 7½ per cent royalty as prescribed under said agreements, and have withheld from plaintiff proceeds of sale of oil and gas from said well in excess of $25,000; defendants have refused to render a true accounting; they have charged against production expense costs not applicable thereto; they have taken pipe and casing for their own use and have refused to account therefor; and they have refused to deposit the proceeds of sale of oil and gas in the operating bank account.

In the answer to the amended complaint, the defendants alleged that about January 15, 1952, the defendant Coast Exploration Company transferred all its assets to C. J. Gibson; defendants carried on the drilling operations, and about February 14, 1951, they brought in a producing well and it has remained on commercial production; they have sold and

continued to sell oil and gas produced from the well and they have continued to make proper deposits of said proceeds; the proceeds at all times through December, 1951, were deposited in the California Bank in Beverly Hills; during March, 1952, plaintiff discontinued using the account in the California Bank as an operating account, and after plaintiff refused to sign a check in payment of landowner's royalty then due, defendants opened an account at the Bank of America as the operating account for the well, and they have deposited therein all funds derived from the sale of oil from said well, and the expenses of operating the well are paid by checks drawn upon said account. As an affirmative defense, defendants made allegations to the effect that in consideration for the loan of $10,000 and as a bonus therefor, defendants transferred a one-third interest in said lease to plaintiff Neaves; that said one-third interest was of a greater value than the sum allowed by law as compensation for making the loan; that the plaintiff in making the advance of $19,720.51 for the benefit of defendants exacted as a bonus an overriding royalty of 7½ per cent; that said bonus was of greater value than the sum allowed by law as compensation for making said advance; that prior to April 30, 1952, defendants had paid to plaintiff $35,787.67, and on said date they paid to plaintiff $25,932.84, which constituted payment of said sum of $61,720.51 and that plaintiff has been paid in full. They asked for judgment declaring plaintiff's interest in the lease ended.

In an amended cross-complaint, defendants alleged, as a first cause of action, to the effect that in paying plaintiff his share of the oil proceeds they had paid, according to certain computations (therein stated), $3,000 on account of a bonus exacted by him, and that plaintiff is indebted to defendants in treble that amount, or $9,000. As a second cause of action therein, they alleged to the effect that in paying plaintiff a part of the overriding royalty they had paid, according to certain computations (therein stated), $175.49 on account of a bonus exacted by him, and that plaintiff is indebted to defendants in treble that amount, or $526.47. They asked for judgment declaring plaintiff's interest in the lease ended.

A question here is whether the relationship of attorney and client existed between Mr. Petty and Mr. Gibson. Although the testimony of Mr. Gibson in his deposition in the municipal court case, regarding attorney's fees, is to the effect that he did not employ Mr. Petty as his attorney, it must be concluded,

from other averments in the affidavits in the present proceeding, that the relationship of attorney and·client existed between them.

The other question herein is whether the attorney was disqualified to represent plaintiff Neaves against defendant C. J. Gibson. The determination of that question depends upon whether or not, in the matter of preparing the oil well agreements for his said clients, there was any communication to the attorney by his client Mr. Gibson which was confidential as against his other client Mr. Neaves.

Mr. Neaves and Mr. Gibson mutually employed Mr. Petty to represent them jointly in the matter of reducing to writing their agreements regarding the oil well lease. In order to indicate the nature of the legal services rendered, and to indicate the existence or nonexistence of confidential communications during such relationship, it has been necessary to set forth in some detail the provisions of said written agreements and the conversations had with respect to employing and instructing the attorney. There is nothing in the agreements or conversations, or in the nature of the transactions referred to therein, that indicates there was any confidential communication between the attorney and either Mr. Gibson or Mr. Neaves. Where two persons mutually employ the same attorney to represent them as their common agent and attorney in a particular transaction, the communications made by either. of them in the presence of the other to the attorney are privileged as to strangers to the transaction, but are not privileged as between either of them and the attorney. (See *Clyne* v. *Brock,* 82 Cal.App.2d 958, 965 [188 P.2d 263] ; *Croce* v. *Superior Court,* 21 Cal.App.2d 18, 20 [68 P.2d 369] ; *De Olazabal* v. *Mix,* 24 Cal.App.2d 258, 262 [74 P.2d 787].) "The reason assigned for the rule is that, as between the clients, communications made for the mutual benefit of all lack the element of confidentiality which is the basis of privileged communications." (58 Am.Jur., pp. 277-278, § 496.) In *Murphy* v. *Waterhouse,* 113 Cal. 467 [45 P. 866, 54 Am. St.Rep. 365], it was held that an attorney, who was attorney for both the maker and payee of a promissory note and who was present with them when the note was executed, was not disqualified as a witness in litigation between the parties based on the note. The court said (p. 470) that the communications between the parties and the attorney were not privileged. It was also said therein at pages 470 and 471: "The rule, however, is the same where the witness is attorney for only one

of the contracting parties. Where two persons are negotiating with each other in the presence of the attorney of one of the parties, the very nature of the transaction, and the circumstances surrounding it, are inconsistent with the notion of a confidential communication between one of the parties and his attorney who happens to be present.'' In *Croce* v. *Superior Court, supra,* 21 Cal.App.2d 18, it was held that a former attorney for several persons was not disqualified from representing one of them as plaintiff in subsequent litigation against the others. It was said therein at page 20 : ''. . . if under the circumstances stated an attorney is not disqualified from serving as an adverse witness, it cannot be held that under the same circumstances he is disqualified from serving as an adverse attorney.'' In the present case, the conversations of both parties with the attorney as to his employment, his instructions to reduce their oral agreements to writing, and the terms of their oral agreements, were in the presence of both parties and the attorney. At times, however, there were conversations between the attorney and one of the parties out of the presence of the other party. As above indicated, the agreements and the nature of the transaction are not such as to indicate there would be privileged communications as between either client and the attorney. The pleadings do not indicate an issue involving alleged confidential communications. The complaint in the action is for an accounting under the provisions of the agreements. The answer alleges a proper accounting, and the cross-complaint is based upon a theory of alleged usury. Mr. Gibson does not assert that any conversation which he had with the attorney out of the presence of Mr. Neaves was confidential. It is to be noted that Mr. Gibson testified in the municipal court case to the effect that Mr. Petty was not his attorney. Also, in the present proceeding he stated in effect that he did not understand that he was expected to pay any part of the attorney's fees. In view of those statements by Mr. Gibson, it is understandable that he does not assert that his conversation with the attorney out of the presence of Mr. Neaves was confidential. It is to be assumed, under the circumstances herein, that such conversation was not confidential. Ordinarily, the attorney for both parties is not the depositary of confidential communications from either party which ought to be withheld from the other.'' (58 Am.Jur., p. 278, § 496.) It is not to be assumed that Mr. Gibson, out of the presence of Mr. Neaves, gave to their attorney material information which

the attorney ought to withhold, as confidential information, from Mr. Neaves. ▮ The communications between Mr. Gibson and Mr. Petty were not privileged communications. Mr. Petty was not disqualified to be attorney for Mr. Neaves in said action of *Neaves* v. *Gibson*.

The order restraining petitioner from representing plaintiff and cross-defendant Neaves is annulled.

Shinn, P. J., and Vallée, J., concurred.