556 P.2d 792
**In the Matter of a Member of the State Bar of Arizona, Jack E. EVANS, Respondent.**
**No. SB–89.**

Supreme Court of Arizona,
In Banc.
Oct. 22, 1976.

Kaplan, Kaplan, Jacobowitz & Hendricks, by Henry Jacobowitz, Phoenix, for State Bar of Arizona.

Burch, Cracchiolo, Levie, Guyer & Weyl, by Frank Haze Burch, Phoenix, for respondent.

CAMERON, Chief Justice.

This matter is before the court on the objections of the respondent, Jack E. Evans, to the findings and recommendations of the Board of Governors of the State Bar of Arizona that the respondent be censured.

We must answer two questions on appeal:

1. Was the respondent's conduct unprofessional?

2. If so, should respondent be censured?

The facts in the instant case are sharply contested by the respondent Jack E. Evans and the complainants, Earl Weaver and Joseph Volk. We have the duty to make an independent determination of the facts from the record. *In re Johnson,* 106 Ariz. 73, 471 P.2d 269 (1970).

"* * * we will nevertheless give serious consideration to the recommendations of the Board of Governors of the State Bar of Arizona, *In Re Brown,* 101 Ariz. 178, 416 P.2d 975 (1966), as well as the findings and recommendations of the local administrative committee. * * *" *Matter of Lurie,* 113 Ariz. 95, 546 P.2d 1126 (1976).

We find the facts necessary for a determination of this matter to be as follows. Respondent, for several years prior to 1972, had represented the Landmark Manufacturing Company, Inc., and its stockholders, Mr. and Mrs. Ernest Siegfried. In the spring of 1972, the Siegfrieds entered into negotiations with the complainants, Earl Weaver and Joseph Volk to participate in the development of a mobile home park. At this time, Weaver and Volk made available to Mr. Siegfried various items of a financial and confidential nature which were to be used by Siegfried in making his decision whether to participate. After reviewing this information and meeting Weaver and Volk personally, respondent advised the Siegfrieds that it was unwise to enter into the venture.

After further negotiations, however, it was agreed that Siegfried and Landmark would provide Weaver and Volk with mobile homes to be manufactured by Landmark. Landmark was to carve out and reserve a portion of its mobile home production for the proposed development. At Siegfried's suggestion, the parties met with the respondent in respondent's office to discuss the contract to be drawn between the two. In discussing the legal status of Weaver and Volk, it became the opinion of respondent that the alleged limited partnership of Weaver and Volk did not conform to the Uniform Limited Partnership Act and that something would have to be done before a contract could be signed. Weaver asked respondent to form the corporation and respondent suggested Weaver and Volk should seek further counsel in connection with this legal work. As Weaver testified on examination by bar counsel:

"QUESTION: Is that all that you can remember with regard to what was said by Mr. Evans regarding his representation of Landmark?

"ANSWER: That's all I can recall. And, as I stated, that his loyalty was to the first client, I admit that, yes.

"QUESTION: Now did Mr. Evans tell you anything regarding whether you could go and have independent counsel?

"ANSWER: Yes, he did. He asked if we would care to have independent counsel look at the document.

"ANSWER: Mr. Evans very plainly gave us to understand that his loyalty was to his first client, of course was to Landmark Manufacturing Company.

I indicated we understood this, we were aware of it, however, I also indicated very plainly that Mr. Evans was representing us and that we would proceed on his judgment and we had no other ideas whatsoever."

And Mr. Siegfried also testified as to the meeting:

"QUESTION: What did he tell them at that time?

"ANSWER: He told them at that time that he could incorporate them, that he was the attorney of Landmark Manufacturing, and had from the time that we were incorporated dating back to 1968, and he represented both Mrs. Siegfried and myself as well as the two corporations, and that in the event of any contest whatsoever in any agreement he would draw he certainly would be representing Landmark.

"QUESTION: Did he say that in your presence?

"ANSWER: Yes. He further advised them that they should obtain counsel.

\* \* \* \* \* \*

"QUESTION: Just let me get this straight in my own mind. At the time you were discussing the incorporation did Jack tell them if there was any conflict or disagreement that he would represent Landmark in the litigation?

"ANSWER: Yes, he did."

Respondent Evans and his firm prepared articles of incorporation for Weaver and Volk, and did some negotiating concerning financing on their behalf with a bank in Wisconsin. The respondent did not bill Weaver and Volk for the drafting of the agreement, but did bill them for incorporating and other matters not connected with the drafting and signing of the agreement. The last work the respondent performed for Weaver and Volk occurred in September of 1972.

In December of 1972, a dispute arose concerning the performance under the contract and the respondent brought suit against the corporation and Weaver and Volk on behalf of his client, Landmark, and the Siegfrieds. After the attorney for Weaver and Volk indicated he intended to call the respondent as a material witness, respondent withdrew from the suit and the matter was turned over to another attorney though respondent did, by mutual consent, attend one conference on behalf of the parties to the agreement in trying to settle a dispute with some third parties.

Weaver and Volk wrote to the State Bar of Arizona complaining of respondent's alleged conflict of interest and misuse of confidential information obtained by the respondent as a result of respondent's representation. Hearing was held by the Local Administrative Committee. Neither the Committee nor the Board of Governors found that there was a misuse of confidential information and a reading of the transcript compels us to agree. The record also supports the conclusion that the respondent properly notified Weaver and Volk early in the stages of the negotiations that respondent represented the Siegfrieds and Landmark, and that further respondent never billed Weaver and Volk for any work done in the preparation of the agreement. Though the respondent was careful not to treat Weaver and Volk as clients in the preparation of the agreement, it is clear that Weaver and Volk were otherwise clients of respondent for other matters and it is not unreasonable that Weaver and Volk considered themselves respondent's clients for all purposes.

The Local Administrative Committee agreed that Weaver and Volk were clients at the time of the agreement and found that respondent violated Canon 5 and DR No. 5–105(A) by suing "one client on behalf of another client based upon an Agreement he prepared for both of them," and that the respondent be formally censured. The Board of Governors reviewed the recommendations of the Local Administrative Committee and found that:

"The Respondent violated Canon No. 5 and D.R. No. 5–105A when he sued a former client on behalf of another client based upon an agreement that Respondent prepared and arising out of a transaction between the two clients upon which Respondent had from time to time represented both clients before and after the preparation of the agreement."

They also recommended censure. Respondent objected and the matter was brought to this court.

## WERE RESPONDENT'S ACTIONS IMPROPER?

Canon 5 of the Code of Professional Responsibility states, "A lawyer should exercise independent professional judgment on behalf of a client." Disciplinary Rule 5-105(A), (B), and (C) of the Code of Professional Responsibility, Rule 29(a) of the Rules of the Supreme Court, 17A A.R.S., reads as follows:

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR5-105(C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR5-105(C).

"(C) In the situations covered by DR5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

■ There is no doubt that an attorney who prepares an agreement for one party and then sues on behalf of another party attacking the validity of that agreement is guilty of unprofessional conduct. *Cord v. Smith*, 338 F.2d 516 (9th Cir. 1964). There is respectable authority, however, that an attorney may represent two clients in the preparation of an agreement and then sue one of the parties to the agreement for failure to abide by the terms of that agreement.

In *Petty v. Superior Court*, 116 Cal. App.2d 20, 253 P.2d 28 (1953), for example, the attorney prepared an agreement between Neaves and Gibson on behalf of both parties. He billed them both for the preparation of the documents and later represented Neaves against Gibson in a suit upon the agreement. The court stated:

"* * * Where two persons mutually employ the same attorney to represent them as their common agent and attorney in a particular transaction, the communications made by either of them in the presence of the other to the attorney are privileged as to strangers to the transaction, but are not privileged as between either of them and the attorney. * * *

\*  \*  \*  \*  \*  \*

"* * * It is not to be assumed that Mr. Gibson, out of the presence of Mr. Neaves, gave to their attorney material information which the attorney ought to withhold, as confidential information, from Mr. Neaves. The communications between Mr. Gibson and Mr. Petty were not privileged communications. Mr. Petty was not disqualified to be attorney for Mr. Neaves in said action of *Neaves v. Gibson*.

"The order restraining petitioner from representing plaintiff and cross-defendant Neaves is annulled." *Petty v. Superior Court, supra,* 253 P.2d at 33, 34.

As indicated by the language in *Petty*, supra, some courts hold that the determination as to whether an attorney may sue a former client hinges on the question of confidentiality. If the attorney received confidential information he may not use it to sue his former client. If he received no confidential information he may sue his former client. Our Court of Appeals has stated:

"The principle which bars an attorney from representing an interest adverse to that of a former client is most often said to be grounded upon the confidential relationship which exists between attorney and client, the courts taking the view that, by imposing this disability upon the attorney, confidential information con-

veyed by the former client is protected from possible disclosure and wrongful use. See 52 A.L.R.2d 1243, 1250, § 4 and cases cited therein. An "attorney's acceptance of employment, however, to act in opposition to his former client is not ipso facto improper. The attorney is not disqualified if his subsequent employment has no reference to the matters with which the previous attorney-client relationship was concerned. *Gillett v. Gillett,* 269 Mich. 364, 257 N.W. 719, 720 (1934); *Klein v. Matthews,* 99 Utah 398, 106 P.2d 773, 775 (1940); *Adams v. Adams,* 156 Neb. 778, 58 N.W.2d 172, 182 (1953)." *Nichols v. Elkins,* 2 Ariz.App. 272, 277, 408 P.2d 34, 39 (1965).

■ We are not, however, convinced that this is the better rule. Canon 9 of the Code of Professional Responsibility states a lawyer should avoid even the appearance of professional impropriety. The problem here is not that respondent intended improper conduct or that he failed to properly notify the complainants of his loyalty to his clients, prior and superior, the Siegfrieds and Landmark. He had no such intention and he did properly notify the complainants of his loyalties. Respondent, however, by representing the complainants on other matters at the time of his drafting of the agreement, created the appearance that he was, in fact, representing the complainants at the same time, and it is not surprising that complainants believed he was their attorney at the time the agreement was being drawn. In order to avoid the appearance of impropriety, the matter should not rest upon the question of receipt of confidential information alone:

"In our opinion, the rule that an attorney who has represented one party in a transaction may not thereafter represent the other party in an action against his former client, arising out of or closely relating to the transaction, does not depend for its operation upon a subsidiary decision as to whether the attorney would or might be using or misusing confidential information derived from his former client. (footnote omitted) We think that the famous words of Judge Cardozo in *Meinhard v. Salmon,* 1928, 249 N.Y. 458, 464, 164 N.E. 545, 546, 62 "A.L.R. 1, in which he was defining the duties of a trustee, are equally applicable to an attorney-at-law in relation to his conduct in the federal courts: 'Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd'." *Cord v. Smith, supra,* 338 F.2d at 524–525.

■ An attorney's loyalty to his client is not just a casual obligation to be turned on or off as the dictates of the moment indicate or particular employment may demand. We do not say that an attorney may never sue an ex-client on behalf of another client, but we do think, considering all the circumstances present in the instant case and the short period of time between representation and suit, that the conduct of respondent was professionally improper.

### SHOULD RESPONDENT BE CENSURED?

We do not believe, however, that respondent should be censured. There was a respectable division of authority which was recognized by the Board of Governors in this matter which will allow an attorney to

prepare documents for both parties and then sue one of the parties to enforce the contract:

"\* \* \* The issue is a highly debatable one. No clear-cut rule on the subject has been announced. It is not proper to discipline an attorney for a violation of a claimed principle that was and is so highly debatable." *Arden v. State Bar of California,* 52 Cal.2d 310, 319, 341 P.2d 6, 11 (1959).

Since we have not specifically spoken on this issue and there is nothing in the Canons directly on point from the Arizona Advisory Committee to guide respondent, he should not be required to follow existing case law from other jurisdictions at his peril. We do not believe, therefore, that respondent should be censured.

So ordered.

STRUCKMEYER, V. C. J., and HAYS and J. MERCER JOHNSON, Retired Justice, concurring.

NOTE: Justices WILLIAM A. HOLOHAN and FRANK X. GORDON, Jr., did not participate in the determination of this matter and retired Justice J. MERCER JOHNSON sat in their stead.