685 P.2d 1309

William Stewart ALEXANDER and
Constance Jean Alexander, husband
and wife, Petitioners,

v.

SUPERIOR COURT of the State of Arizo-
na, In and For the COUNTY OF MARI-
COPA; Honorable Peter D'Angelo,
Judge thereof; State of Arizona, ex rel.,
Robert K. Corbin, Attorney General;
and the Arizona Corporation Commis-
sion, real parties in interest, Respon-
dents.

No. 17343–SA.

Supreme Court of Arizona,
In Banc.

May 29, 1984.

Reconsideration Denied July 10, 1984.

Farley, Robinson & Lee by James J. Farley, R. Chip Larsen and Harris & Peacock by Donald W. Harris, Phoenix, for petitioners.

Robert K. Corbin, Atty. Gen. by Patrick M. Murphy, Ronald W. Collett, Michael W. Sillyman, Asst. Attys. Gen., Phoenix, for respondents.

CAMERON, Justice

This is a petition for special action taken from an order of the trial court disqualifying petitioners' attorneys, Farley, Robinson & Lee, from further representation of the petitioners, William Stewart Alexander and Constance Jean Alexander. We have jurisdiction pursuant to Art. 6, § 5(4) of the Arizona Constitution and Rule 8, Arizona Rules of Procedure for Special Actions, 17A A.R.S.

We must answer one question:

Does the State have standing to object to petitioners' representation by Farley, Robinson and & Lee?

The facts necessary for a determination of this matter on appeal follow. Prior to November, 1982, the Alexanders were engaged in selling tax shelters in greyhound racing dogs. The Internal Revenue Service disallowed most of the investment tax credits, depreciation, and other deductions claimed by the investors who had purchased greyhound racing dogs from the Alexanders.

In November of 1982, Alexander asked his legal counsel, Greg Robinson of Farley, Robinson & Lee, to represent the investors in Tax Court for the purpose of obtaining a reversal of the IRS rulings. Robinson sent a form letter to over seventy investors, advising them that he had been retained by Mr. Alexander to file petitions in Tax Court. The letter read:

Dear _____:

I have been retained by Mr. William S. Alexander to file United States Tax Court petitions with respect to the Notices of Deficiency issued by the Internal Revenue Service relating to greyhound investments. I will be filing a group petition on behalf of you and other investors.

Mr. Alexander has provided me with a copy of the Notice of Deficiency mailed to you. I have not received a copy of the A & A Kennels file on your greyhound investment.

Enclosed is a checklist of inv formation which will enable me to pursue this matter on your behalf. Please complete the form and return it to me in the enclosed envelope no later than November 15, 1982.

Investors interested in being represented by Robinson in the Tax Court were asked to complete a checklist of information so that Robinson could pursue the matter on their behalf. Thereafter, Robinson filed petitions on behalf of most of the investors who were contacted based upon the information submitted by the investors and the Alexanders' kennel file on each investor's greyhound. Robinson did not bill the investors for these services but did, as the letters indicated, look to the Alexanders for his attorney fees in the matter.

Robinson did not meet personally with any of the investors, and his only contact with them, with one exception, was limited to phone inquiries by the investors as to the status of the petitions. Robinson also advised the investors to settle with the IRS because the prospects of success in Tax Court were not promising. The only exception was Perry Johnson, who called Robinson to inquire about the status of the petitions. In the course of this conversation, Johnson disclosed to Robinson that, on the advice of Alexander, he had backdated a document relating to his investment. Johnson's affidavit (obtained by the State) read:

41. That I received a letter dated November 2, 1982, from Gregory A. Robinson (Robinson) of Farley, Robinson & Lee, attorneys for William S. Alexander * * *. In this letter Mr. Robinson advised me that he was retained by Alexander to file petitions on behalf of investors in greyhound dogs with the IRS in respect to the Notices of Deficiency. I completed a form authorizing him to represent me in this action.

\* \* \* \* \* \*

43. That I did not hear anything further from Mr. Robinson regarding the status of the IRS case. On approximately October 6, 1983, I called Mr. Robinson to find out the status of the case. I informed him that I had been advised by Mr. Alexander that if I paid for the dog before April, 1980, I would be able to obtain a tax credit for 1979 and 1980; that Alexander had filled out the Bill of Sale * * *, back-dating it to March 31, 1979 and signed it in my presence.

44. That Mr. Robinson responded that "quite candidly" the IRS was looking for that type of information and if they found out about it they could criminally prosecute Alexander and myself. He implied that I should not pass this information on to anyone else. He also told me that because my dog was dead I did not have a good case to support the tax credits and deductions which I took on my 1979 and 1980 tax returns. I asked

Mr. Robinson if he was still representing me and he was very evasive.

45. That Mr. Robinson has given me no legal advice concerning my tax audit as to whether I should pay my tax liabilities, proceed with the tax audit, appeal from an adverse determination or whether I have a cause of action against Alexander.

In September of 1983, after the last petition was filed in the Tax Court, the State served the Alexanders a summons and complaint alleging violations of the Arizona Securities Act, A.R.S. § 44–1841, et seq., the Arizona Consumer Fraud Act, A.R.S. § 44–1521, et seq., and the Arizona Racketeering Act, A.R.S. § 13–2301, et seq. The case was denominated a "priority case" pursuant to A.R.S. § 13–2314(H), which requires that the matter be expedited. Simultaneously, a temporary restraining order without notice was issued and the Alexanders' assets and accounts were seized. The next day the Alexanders were served with twenty-three separate pleadings and papers.

Before the Alexanders could respond, the State filed a motion to disqualify Farley, Robinson & Lee from further representation of the Alexanders. The State contended that the law firm's representation of the investors in Tax Court would place it directly in conflict with its representation of the Alexanders in the present action. The State also alleged that the information given by investor Johnson was a client confidence and that its disclosure would violate Canon 4 of the Model Code of Professional Responsiblity.

On 5 January 1984 the Superior Court, after a hearing, issued an order to the effect that (1) while an apparent mutuality of interests existed between the Alexanders and the investors, one exception was the communication to Robinson from investor Johnson regarding backdating, (2) such communication was a client confidence under DR 4–101, and (3) this circumstance alone constituted a sufficient conflict of interest to disqualify Farley, Robinson & Lee from further representation of the Al-

exanders. Disqualification of counsel was ordered and the Alexanders sought relief by filing a special action in this court. We granted oral argument and a stay of proceedings in the Superior Court. After oral argument we accepted jurisdiction because there is no plain, speedy, or adequate remedy by appeal and because it is a matter of statewide importance. *See State v. Superior Court of Arizona, In And For the County of Maricopa*, 129 Ariz. 156, 159, 629 P.2d 992, 995 (1981).

■ Only in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of his opponent, *e.g., Board of Education of New York City v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979); *Trinity Ambulance Service, Inc. v. G & L Ambulance Services, Inc.*, 578 F.Supp. 1280, 1282 (D.Conn.1984). The burden should be upon the moving party to show sufficient reason why an attorney should be disqualified from representing his client. Whenever possible the courts should endeavor to reach a solution that is least burdensome upon the client or clients.

The State's allegations bring into play three Canons from the American Bar Association's Model Code of Professional Responsibility: Canon 4 ("A Lawyer Should Preserve the Confidences and Secrets of a Client"), Canon 5 ("A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client"), and Canon 9 ("A Lawyer Should Avoid Even the Appearance of Professional Impropriety"). We have adopted the Model Code as part of the Arizona Rules of the Supreme Court, with some modifications. Rule 29(a), Arizona Rules of the Supreme Court, 17A A.R.S. The Canons themselves do not appear in our Rules. Instead, our Rules consist of Disciplinary Rules (DR's) derived from the Model Code's rules. The confidence rule states:

> Preservation of Confidences and Secrets of a Client
>
> (A) "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.
>
> (B) Except as permitted by DR 4–101(C), a lawyer shall not knowingly:
>
> (1) Reveal a confidence or secret of his client.
>
> (2) Use a confidence or secret of his client to the disadvantage of the client.
>
> (3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.
>
> \* \* \* \* \* \*

DR 4–101, Rule 29(a), Arizona Rules of Supreme Court, 17A A.R.S. The conflict of interest rule reads:

> Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer
>
> (A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).
>
> (B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).
>
> (C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each client.
>
> \* \* \* \* \* \*

DR 5–105, Rule 29(a), Arizona Rules of the Supreme Court, 17A A.R.S.

■■ A communication between a client and his attorney is considered confidential, and therefore privileged, if "the communication [was] made in the context of the attorney-client relationship and [was] maintained in confidence." Casenote, 19 Ariz.L. Rev. 587, 592 (1977); *accord,* Casenote, 19 Ariz.L.Rev. 602, 610 (1977). *See also,* A.R.S. § 12–2234 (attorney-client testimonial privilege). When considering whether a confidence was received, we must first determine if an attorney-client relationship existed. We believe the appropriate test is a subjective one, where "the court looks to the nature of the work performed and to the circumstances under which the confidences were divulged." Developments of the Law—Conflicts of Interest in the Legal Profession, 94 Harv.L.Rev. 1244, 1321–22 (1981) ["Developments"]. E.g., *Westinghouse Electric Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311, 1319–20 (7th Cir.1978), cert. denied, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978); *Trinity,* supra, at 1283. "An attorney-client relationship is said to exist when the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice." *Trinity,* supra, at 1283, citing Developments, supra, at 1322.

■ In the present case, an attorney-client relationship existed between Robinson and the Alexanders. Robinson gave the Alexanders advice concerning the tax shelters and other transactions. He consented to representing the Alexanders in Tax Court and, as part of Robinson's representation of the Alexanders, consented to represent the investors who had purchased the tax shelters. Robinson's relationship with the Alexanders is clearly an attorney-client relationship.

■■ Whether the client thought an attorney-client relationship existed is important in evaluating the relationship. *Trinity,* supra, at 1283. The record shows it would have been reasonable for Johnson and the other investors to believe Robinson

was their attorney for the Tax Court case. Johnson completed the form authorizing Robinson to represent him and the checklist of information for Robinson's use. Johnson has not sought to retain another attorney. Even though Robinson did not advise Johnson concerning his tax audit, tax liabilities, possible appeals, or other causes of action (for example against the Alexanders), we find Robinson was the attorney for the investors, including Johnson, in the Tax Court.

■■ We must next decide whether any confidential communications were made and maintained. Apparently, the only possibly confidential communication was Johnson's statement concerning the backdating of the bill of sale. We believe, however, that the simultaneous representation exception applies:

[I]t is our conclusion that the privilege provided by the law, statutory or common, although quite conclusive as between an attorney and a sole client, does not apply as to communications between the parties involved in a given transaction which has been submitted to an attorney for action or advice by two or more persons for their mutual benefit.

\* \* \* \* \* \*

[I]t seems desirable and proper to permit and encourage the consultation of an attorney by several parties on matters or transactions in which they have joint and mutual interests, although in almost every such case there is a potential conflict of interest and, if and when it develops, that lawyer cannot and should not try to render further service or advice therein.

*Henke v. Iowa Home Mutual Casualty Company,* 249 Iowa 614, 620–21, 87 N.W.2d 920, 924 (1958). *See also,* Moore, Conflicts of Interest in the Simultaneous Representation of Multiple Clients: A Proposed Solution to the Current Confusion and Controversy, 61 Tex.L.Rev. 211, 226 (1982) ("Potential benefits that may outweight the risk of multiple representation include reduced legal fees, the avoidance of unnecessary future conflicts, and, in litiga-

tion, the opportunity to present a united front."). Thus, there is a recognized presumption that "[a]s between joint clients ordinarily there is no expectation of confidentiality." Udall & Livermore, Arizona Practice, Law of Evidence § 74 at 142. E.g., *Nitrini v. Feinbaum*, 18 Ariz.App. 307, 313, 501 P.2d 576, 582 (1972); *Nichols v. Elkins*, 2 Ariz.App. 272, 277, 408 P.2d 34, 39 (1965); *Petty v. Superior Court*, 116 Cal.App.2d 20, 29, 253 P.2d 28, 34 (1953). In the instant case, the Alexanders have no objection to Robinson's continued representation, and because Johnson has revealed any information that might have been confidential, that information is no longer privileged. If the client himself does not treat the particular communication as privileged, that communication will not be recognized as a confidence by this court. *See Allegaert v. Perot*, 434 F.Supp. 790, 800 (S.D.N.Y.1977), aff'd 565 F.2d 246 (2d Cir. 1977)("secondary" client did not have any expectation that his communication would be kept secret from "primary" clients); *Petty*, supra, 116 Cal.App.2d at 29, 253 P.2d at 34 (client being jointly represented did not assert that information given out of the presence of other client was confidential and therefore no confidential communication found); Udall & Livermore, supra, at 142 ("if the client were to tell people what he told his lawyer, the privilege could be found no longer to attach either on the ground that this was an implicit waiver or that such conduct demonstrated the original communication not to have been intended to be confidential.").

▪ Johnson has not treated the information concerning the backdated document as if it were privileged. He testified to the information in an affidavit, which has become a matter of public record. If the information ever were privileged, that privilege has been implicitly waived. DR 4–101 is not applicable to the present case.

▪ The question remains whether DR 5–105 would disqualify petitioner's counsel from representing the investors in Tax Court. Concurrent representation does not become a problem unless the interests of the clients are adverse or become adverse during the trial. *See State v. Latigue*, 108 Ariz. 521, 522, 502 P.2d 1340, 1341 (1972); *In re Maltby*, 68 Ariz. 153, 155, 202 P.2d 902, 903 (1949). "When adverse representations are undertaken concurrently, * * * the appropriateness of disqualification must be measured against 'the duty of undivided loyalty which an attorney owes to each of his clients.' * * * [T]he court's attention in these cases will likely be riveted on the more compelling grounds provided by Canon 5 and the ancient maxim that 'no man can serve two masters'." Note, The Chinese Wall Defense to Law-Firm Disqualification, 128 U.Penn.L.Rev. 677, 684 (1980).

▪ Although the Alexanders and the investors had mutual interests when Farley, Robinson & Lee agreed to represent the investors, it appears that adverse interests may develop between the two parties. Because of this, the firm may no longer represent the investors under DR 5–105. The Alexanders are the firm's "primary" clients and should retain the firm's loyalties over and above the investors. *See Allegaert v. Perot*, supra, at 800, aff'd 565 F.2d 246 (2d Cir.1977) ("the firms' respective clients are entitled to the continued services of the lawyers upon whose advice they have been relying over these many years"); accord, *Williamsburg Wax Museum v. Historic Figures*, 501 F.Supp. 326, 330 (D.D.C.1980); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 479 F.Supp. 465, 468–69 (E.D.La.1979). The investors, therefore, must employ other counsel.

▪ We are next presented with the problem of representation adverse to that of a former client. The investors will now be former clients of Farley, Robinson & Lee because the firm has been disqualified from representing them. The seminal case in the area of former client representation held that

the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the mat-

ters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on hte subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.

*T.C. Theatre Corp. v. Warner Barothers Pictures, Inc.,* 113 F.Supp. 265, 268–69 (S.D.N.Y.1953). The present litigation is, indeed, "substantially related" to the Tax Court litigation. As we have stated, however, the present case does not involve any disclosures of confidential information from Farley, Robinson & Lee's former clients. Thus, the substantial relationship test is not applicable. Several courts have agreed with this reasoning. *See Trinity,* supra, at 1284; *Allegaert,* supra, at 798, aff'd 565 F.2d 246 (2d Cir.1977); *Williamsburg Wax Museum,* supra, at 330; *Domed Stadium Hotel,* supra, at 468–69. We find no conflict of interest.

Although not adopted by this court at this time, we feel it important to discuss two of the rules found in the American Bar Association Model Rules of Professional Conduct adopted by the House of Delegates on 2 August 1983. Rule 1.7 addresses multiple representation and reads:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

In the present case, petitioners' counsel has asked to be relieved of representing the investors in Tax Court in an effort to avoid a possible conflict of interest. It is therefore obvious that petitioners' counsel did not reasonably believe that representation of the Alexanders would not be adversely affected or did believe that representing the investors might materially limit the firm's responsibilities to the Alexanders. Thus, the firm was correct in asking to withdraw from the Tax Court case.

Model Rule 1.9 reads:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

(b) use information relating to the representation to the disadvantage of the former client except * * * when the information has become generally known.

We believe our holding in the present case meets both sections of Rule 1.9. Section (a) of the Rule codifies the substantially related test of *T.C. Theatre,* supra. We have already held that the substantially related test is not applicable in this case. See discussion, supra, at 1315. Neither would Farley, Robinson & Lee be restricted from representing the Alexanders under Section (b). The comment to Rule 1.9 provides further instruction:

Information acquired by the lawyer in the course of representing a client may not subsequently be used by the lawyer to the disadvantage of the client. How-

ever, the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client.

Because Johnson's statement about backdating the document "has become generally known," it would not be excludable under Rule 1.9(b).

 We are, then, only concerned with the "appearance of impropriety," and the question we have before us is whether an appearance of impropriety alone will give a party standing to interfere with an adverse party's choice of counsel. We agree with the line of cases that have applied a stricter scrutiny when reviewing possible Canon 9 violations as a basis for disqualification. *See Board of Education of New York City v. Nyquist,* 590 F.2d 1241, 1247 (2d Cir. 1979) ("when there is no claim that the trial will be tainted, appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest of cases"); *Woods v. Covington County Bank,* 537 F.2d 804, 819 (5th Cir. 1976) ("Inasmuch as attempts to disqualify opposing counsel are becoming increasingly frequent, we cannot permit Canon 9 to be manipulated for strategic advantage on the account of an impropriety which exists only in the minds of imaginative lawyers"); *International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1295 (2d Cir.1975) ("Canon 9 * * * should not be used promiscuously as a convenient tool for disqualification when the facts simply do not fit within the rubric of other specific ethical and disciplinary rules"). *See also* ABA Formal Opinion 342 (24 Nov. 1975). It is obvious from a reading of these cases that the use of Canon 9 "as a convenient tool for disqualification" should not be encouraged. "To call for the disqualification of opposing counsel for delay or other tactical reasons, in the absence of prejudice to either side, is a practice which will not be tolerated." *Cottonwood Estates v. Paradise Builders,* 128 Ariz. 99, 105, 624 P.2d 296, 302 (1981).

 We believe that the court, when considering a motion for disqualification based upon the appearance of impropriety, should consider the following: (1) whether the motion is being made for the purposes of harassing the defendant, (2) whether the party bringing the motion will be damaged in some way if the motion is not granted, (3) whether there are any alternative solutions, or is the proposed solution the least damaging possible under the circumstances, and (4) whether the possibility of public suspicion will outweigh any benefits that might accrue due to continued representation. After answering these questions, we do not believe the State's motion should be granted.

First, we believe that the motion is, indeed, being made for the purpose of harassing petitioners. By "drying up" petitioners' funds, the State has successfully prevented petitioners from engaging the services of a lawyer. Even if the petitioners were possessed of sufficient funds, obtaining the services of a new attorney and having him "brought up to date" in time to respond would cause petitioners to incur a much greater expense.

Second, the State has not shown it will be damaged if the motion is not granted. The only damage in this case appears to be to the Alexanders if they are denied the assistance of their counsel, Farley, Robinson & Lee.

Third, there is at least one alternative solution. Withdrawal by petitioners' counsel in the Tax Court case alleviates any possible conflict of interest that might have occurred and is a much less disruptive solution than disqualification.

Fourth, we believe disqualification at this point might actually raise public suspicion. The State appears to be using disqualification as a tactical tool. This can only promote general public suspicion of the legal profession. "[F]or the [State] to participate in the selection or rejection of its opposing counsel is unseemly if for no other reason than the distasteful impression which could be conveyed." *State v. Madrid,* 105 Ariz. 534, 535, 468 P.2d 561, 562

**166**

(1970). See also *Rodriguez v. State*, 129 Ariz. 67, 70, 628 P.2d 950, 953 (1981); *Knapp v. Hardy*, 111 Ariz. 107, 112, 523 P.2d 1308, 1313 (1974).

Several benefits will accrue due to continued representation. The Alexanders will be represented by an attorney familiar with the case. This should save money and avoid delay. The State has declared this a priority case which means that it must be expedited by the court. By allowing the attorneys who are most knowledgeable about the case to continue to represent the Alexanders, delay can be avoided and the interest of the State expedited. The facts in this case weigh in favor of continued representation.

We acknowledge that two prior cases, *Matter of Evans*, 113 Ariz. 458, 556 P.2d 792 (1976) and *Bicas v. Superior Court in and for Pima County*, 116 Ariz. 69, 567 P.2d 1198 (App. 1977) may appear to conflict with our holding in the present case. Both cases are distinguishable on their facts. Evans, supra, was a disciplinary case, not a disqualification case, and was brought under DR 5–105. In Evans we held that the attorney in question, "by representing the complainants on other matters at the time of his drafting of the agreement, created the appearance that he was, in fact, representing the complainants at the same time, and it is not surprising that the complainants believed he was their attorney at the time the agreement was being drawn." *Evans*, supra, 113 Ariz. at 462, 556 P.2d at 796. Thus, the action in Evans involved confusion concerning the existence of an attorney-client relationship. That is not the case here. Investor Johnson believed that an attorney-client rela-

tionship existed between he and Mr. Robinson and we agree. Furthermore, we note that there may be situations where attorneys can be in violation of the rules and still not be disqualified from representing their clients.

In *Bicas*, supra, a disqualification action centering upon the possible revelation of client confidences, the court stated that, "any attorney must avoid not only the fact, but even the appearance of representing conflicting interests." 116 Ariz. at 73, 567 P.2d at 1202. Further on in *Bicas*, however, the court held that, "[w]here it can reasonably be said that in the course of former representation an attorney *might* have acquired information related to the subject matter of his subsequent representation, the attorney should be disqualified." *Id.* at 74, 567 P.2d at 1203 (emphasis in original). This statement is limited to the situation where a revelation of a client confidence might be possible. As we stated in our discussion of DR 4–101, supra, that is not the case here.

The matter is remanded to the trial court with directions that the order disqualifying petitioners' attorney be vacated, and for such other proceedings not inconsistent with this opinion.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and FELDMAN, JJ., concur.